**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Howard Dennis Kelly

     v.                               Civil No. 09-cv-260-PB

United States of America, et al.[1]

**REPORT AND RECOMMENDATION**

Before the court is Howard Kelly's complaint (document no. 1), filed pursuant to 42 U.S.C. § 1983 and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), alleging violations of his federal statutory and constitutional rights.[2]  Because Kelly is a prisoner proceeding pro se and in forma pauperis, the complaint is before me for preliminary review to determine whether or not it states any claim upon which relief might be granted.  See 28 U.S.C. § 1915A; United States District Court

---

[1]In addition to the United States of America, Kelly has named the United States Department of justice, the federal Bureau of Prisons, the United States Marshals Services in Portland, Maine, and the Strafford County House of Corrections as defendants to this action.

[2]"The Bivens doctrine allows constitutional claims against federal officials, in their individual capacities, for actions taken under color of federal law."  McCloskey v. Mueller, 446 F.3d 262, 271 (1st Cir. 2006).

District of New Hampshire Local Rule ("LR") 4.3(d)(2)
(authorizing Magistrate Judge to conduct preliminary review of
cases filed by prisoners).

<u>Standard of Review</u>

Under this Court's local rules, when an incarcerated person
commences an action pro se and in forma pauperis, the Magistrate
Judge conducts a preliminary review.  <u>See</u> LR 4.3(d)(2).  In
conducting the preliminary review, the Court construes all of the
factual assertions in the pro se pleadings liberally, however
inartfully pleaded.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94
(2007) (per curiam) (following <u>Estelle v. Gamble</u>, 429 U.S. 97,
106 (1976), to construe pro se pleadings liberally in favor of
the pro se party).  This review ensures that pro se pleadings are
given fair and meaningful consideration.

The court conducting preliminary review must accept as true
any inferences reasonably drawn from the plaintiff's factual
assertions.  <u>See</u> <u>Centro Medico del Turabo, Inc. v. Feliciano de
Melecio</u>, 406 F.3d 1, 5-6 (1st Cir. 2005).  The Court is not
bound, however, to credit legal conclusions, labels,
unsupportable conclusions, and naked assertions.  <u>See</u> <u>Ashcroft v.
Iqbal</u>, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009); <u>Centro</u>

2

<u>Medico</u>, 406 F.3d at 5-6; <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996)).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997); <u>see also</u> <u>Castro v. United States</u>, 540 U.S. 375, 381 (2003) (courts may construe pro se pleadings to avoid inappropriately stringent rules and unnecessary dismissals).

If the Court's construction of the facts, both asserted and implied, constitute well-pleaded factual allegations, a court should accept those allegations as true, and then determine whether the allegations "plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 129 S. Ct. at 1950.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." <u>Id.</u> (internal quotations omitted).  In making the determination of plausibility, the court will examine whether the allegations, as construed, have "'nudged'" the claims "'across the line from conceivable to plausible.'" <u>Id.</u> at 1951 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

Background

Howard Kelly is a federal prison inmate presently housed at the Strafford County House of Corrections ("SCHC").  Kelly has previously been housed at federal correctional facilities in Otisville, New York, Buffalo, New York, and Fort Dix, New Jersey.

On October 1, 2003, while Kelly was housed at the Federal Correctional Institution in Otisville, New York ("FCI Otisville"), he was assaulted by another inmate, John Wayne Narducci.  Narducci was known to FCI Otisville officials to have a history of violent and assaultive behavior during and prior to his incarceration, and to have mental health issues that rendered him unstable.  Prior to assaulting Kelly, Narducci had, on more than one occasion, attacked and seriously injured other inmates. Despite this knowledge, FCI officials allowed Narducci to be housed with Kelly, who was a medium security inmate.

During the October 1, 2003 assault, Kelly states that he was hit in the head from behind, possibly with a weapon, and beaten unconscious.  Kelly suffered a major head trauma with a brain hemorrhage and brain swelling, spent three weeks in a coma after the assault, and is permanently brain damaged.  In addition, as a result of the assault, Kelly suffered a stroke, a deviated

septum, crushed facial sinus, bruising, swelling, and bleeding.
Kelly has had, since the assault, grand mal and petit mal
seizures, ongoing head pain, vision and hearing problems,
dizziness, nausea, impaired coordination and balance causing
frequent falls, a curtailed ability to work, an inability to
drive or operate machinery reliably, interference with a number
of daily living skills, an encumbered ability to enjoy life,
short term memory problems, heightened sleep needs, impaired
thought processes, sleep interference due to nightmares,
cognitive difficulties, and post-traumatic stress disorder
("PTSD").  Kelly states that FCI Otisville officials failed to
provide him with adequate medical care for his ongoing medical
needs occasioned by the October 1, 2003 assault.

Kelly states that he filed a complaint regarding the failure
of FCI Otisville officials to protect him from Narducci, and
their failure to provide him with adequate medical care, with the
federal Bureau of Prisons ("BOP") on June 20, 2005.  On April 6,
2007, having received no response, Kelly contacted the BOP to
inquire as to the status of his complaint.  The BOP responded by
letter dated April 27, 2007, stating that no claim from Kelly had
ever been received.  Kelly alleges that, attached to that letter

was the first page of the claim he had filed in 2005, which indicated that, in fact, they were in possession of the claim.

Six weeks after the October 1, 2003 assault, Kelly was transferred to the Federal Correctional Institution at Fort Dix, New Jersey ("FCI Fort Dix"), where he was housed until October 2005.  Kelly states that while at FCI Fort Dix, he received minimal medical and mental health care and treatment.  At FCI Fort Dix, Kelly was given anti-seizure medication and a number of other medications he requires to treat his medical conditions.

Kelly states that his medical records at FCI Otisville and FCI Fort Dix detail the extent and impact of the physical and psychological injuries he suffered as a result of the October 1, 2003 assault.  These records, Kelly states, make it clear that his physical and psychological injuries are severe, and permanent, and that the injuries require long-term treatment. Kelly further alleges that the specific treatment he requires for those injuries, including his anti-seizure medication and the dosage prescribed for him, is set forth in those records.

On October 17, 2005, Kelly was released from prison, after eleven years of incarceration, to a parking lot in Fort Dix, New Jersey.  Kelly was dropped off with the eight dollars that was in

his inmate account, thirty days' worth of his prescription medicines, no bus ticket, no means of transportation, no home, and no support system to assist him.  Kelly states that the cognitive impairments he suffered as a result of the October 2003 assault rendered him unable to successfully transition to society after his 2005 release.  Kelly was apparently supposed to report to a halfway house upon his release.  Kelly claims he never got the paperwork including those instructions, and so he never reported to his halfway house.  As a result, he was arrested on an escape charge.

Kelly was convicted of escape and reincarcerated on or about May 15, 2006, approximately seven months after his release from FCI Fort Dix.  Kelly says he was transferred to the Buffalo Federal Detention Center ("BFDC") in Buffalo, New York on February 18, 2007.  At that time, Kelly was advised to direct all of his medical service requests to Ms. Garrett, his chronic care provider.  At Kelly's initial meeting with Garrett, he advised her of his medical conditions and his treatment needs related to those problems.

Kelly claims that BFDC officials failed to provide him with the medical treatment he needed for his serious medical

conditions.  Although Kelly generally received his blood pressure
and pain medication at the BFDC, lapses ranging from three days
to up to two months occurred when he would not receive his
prescribed medication.  Kelly states that, while at the BFDC, he
never received his previously prescribed anti-seizure medication
despite repeated requests.  Kelly claims that the BFDC failed to
obtain copies of his medical records from FCI Otisville, FCI Fort
Dix, or the BOP.

Kelly blames an individual named Bailey in the BFDC Medical
Department for failing to provide him with his medication.  Kelly
states that at the end of August or beginning of September 2007,
he was called to the BFDC medical department.  Kelly believed he
was going there to get his medication, as he had been without any
medication for seven to ten days at that time.  When he arrived
at the medical department, Bailey provided him with only one or
two of his prescribed medications.  Kelly states he refused the
partial provision of medications because he was concerned that
accepting the medications would be deemed to be his acquiescence
to receiving only some, and not all of, his medications in the
future.  When Kelly refused his medication, Bailey become upset,
yelling at Kelly, swinging her arms in his face, and invading his

personal space in an effort to intimidate him.  Kelly states he
received no medications for over a month as a result of that
incident.

Beginning on February 1, 2008, BFDC officials adopted a
"double bunking" policy, requiring him to share a cell that was
designed and designated for use by one inmate and was inadequate
to humanely house two inmates.  Kelly states that he was forced
to share a cell with an inmate who had been convicted of sexual
assault, and who had continued to be a sexual predator in prison.
Kelly's medical conditions were such that he was unable to
physically defend himself from his cellmate.  Placing such an
inmate in a small cell with him, Kelly alleges, created an
unnecessary and unreasonable risk that he would be harmed by the
other inmate.  Kelly states that, in fact, he was sexually
assaulted by his cellmate more than once.

Kelly reported the sexual assaults to BFDC Officers Culver,
Maye, Brown, Cichocki, Fernando, and a female officer whose last
name begins with V.  Kelly received no response to his
complaints.  Kelly also filed a complaint with the BOP regarding
the sexual assaults, his inadequate medical care and the double

bunking policy at the BFDC on December 15, 2007, but his complaint was ignored.

In July 2008, Kelly was transferred to the SCHC, a state correctional facility routinely utilized to hold federal prisoners.  Upon his intake at the SCHC, Kelly advised an SCHC Health Services employee of his injuries, medical conditions, and the medical treatment he needs to treat those serious conditions. Kelly also requested that the SCHC Medical Department obtain his medical records from the BOP, and provided SCHC medical personnel with specific information about where his records were located.

Kelly says that upon his intake at SCHC, he was deemed a "chronic care inmate" due to his age and his history of high blood pressure, phlebitis, blood clots, and edema in his legs. Kelly was given to understand that his weight, blood pressure, and general health would be monitored quarterly.  He has never received a quarterly evaluation at the SCHC.  Kelly alleges that although he is receiving his blood pressure medication, his blood pressure has not been checked since December 2008.

Due to Kelly's history of blood clots and edema in his legs, he requires the daily use of compression stockings.  Although the SCHC was made aware of Kelly's need for compression stockings at

10

the time of his intake, it took more than ninety days for the
SCHC medical department to provide him with suitable stockings.
Two weeks after Kelly was provided with compression stockings,
they were confiscated by nonmedical SCHC officers.  It took the
SCHC a month to provide Kelly with a new pair of stockings, and
when they did, the stockings were too small, exacerbating, rather
than alleviating, his condition.  Kelly was finally provided with
a single pair of appropriate stockings.  Because Kelly wears and
then washes the stockings every day, he claims they should be
replaced once a month to maintain their efficacy.  Kelly claims
that at the time this action was filed, he had had the same pair
for more than seven months.

On June 29, 2009, Kelly states that he was assigned to a
cell at the SCHC that is inappropriate to someone with his
medical and psychological conditions.  Specifically, the cell
lacked handrails and elevated fixtures that he needs for balance.
Kelly was also placed in a double cell.  Kelly states that he
requires a single cell due to his PTSD, which causes him to wake
up screaming at night.  Kelly claims that prior to June 29, 2009,
the SCHC had provided him with some necessary accommodations for
his medical conditions, such as an extra mattress, extra

blankets, and a second pillow.  On June 29, 2009, however, SCHC
Officers Bromfield and Casavant, who are not medical personnel,
confiscated those items without authorization from anyone in the
SCHC medical department.  Kelly also claims that Bromfield
endangered his safety by allowing an inmate to come into his cell
while he was sleeping and thus vulnerable to attack.

On July 27, 2009, Kelly was advised that his low-dose
aspirin, that he was prescribed to prevent blood clots and heart
attacks, was discontinued.  He was given neither notice of nor
explanation for the discontinuation of the aspirin.

Kelly claims that he has not received any anti-seizure
medication at the SCHC, even though he has advised the medical
staff there that he is experiencing eight to fifteen grand mal
and petit mal seizures a week.  As a result of the SCHC's failure
to provide him with necessary medical care, Kelly claims his
seizures and other medical conditions have worsened.  Kelly also
complains that he has been denied access to his own medical
records while at the SCHC.  Kelly claims that a person named
Tracy, the Resident Nurse Manager at the SCHC Medical Department,
is responsible for failing to get his records or order his
prescribed anti-seizure medication.  Further, Kelly alleges, SCHC

medical personnel have allowed SCHC nonmedical officers to confiscate items that were ordered for him to help treat his medical needs, such as analgesic muscle rub, antifungal cream, and Bacitracin.  On July 23, 2009, Kelly filed a third claim with the BOP, alleging inadequate medical care at the SCHC, and in particular, the failure to provide him with his anti-seizure medication or to obtain his medical records.

<u>Claims</u>[3]

The claims raised in Kelly's complaint are:

1.    FCI Otisville officials:

    a.    Failed to protect Kelly from harm by improperly classifying a violent inmate, causing Kelly to be assaulted by that inmate;

    b.    Failed to provide Kelly with adequate medical care after he was assaulted by a violent inmate;

2.    FCI Fort Dix officials failed to provide Kelly with adequate medical care;

3.    BFDC officials:

    a.    Failed to obtain Kelly's medical records;

    b.    Endangered Kelly by enacting a double bunking policy on his housing unit;

---

[3]The claims as identified herein will be considered to be the claims raised in Kelly's complaint for all purposes.  If Kelly disagrees with the claims as identified, he must do so by proper objection to this Report and Recommendation or motion to amend his complaint.

      c.    Violated Kelly's Eighth Amendment right to humane conditions of confinement by double bunking him in a cell designed and designated for a single inmate;

      d.    Failed to protect Kelly, a physically incapacitated inmate, from an inmate known to be a sexual predator, resulting in Kelly being sexually assaulted in his cell;

      e.    Failed to provide Kelly with adequate medical care for his chronic health problems; and

      f.    Failed to provide Kelly with anti-seizure medication;

4.    BFDC Officers Culver, Maye, Brown, Cichocki, and a Jane Doe officer violated his rights by ignoring his administrative grievances;

5.    SCHC officials:

      a.    failed to provide Kelly with adequate medical care for his chronic medical problems;

      b.    failed to provide Kelly with anti-seizure medication;

      c.    failed to provide Kelly adequate medical care when they caused a significant delay in enabling Kelly to consistently use compression stockings;

      d.    improperly confiscated medically authorized items from Kelly's cell;

      e.    improperly discontinued his preventative aspirin;

      f.    failed to obtain Kelly's medical records;

      g.    violated Kelly's rights under the Americans with Disabilities Act ("ADA") when they improperly placed Kelly in a non-handicapped cell;

6.   SCHC Officers Bromfield and Casavant violated Kelly's
     Eighth Amendment right to adequate medical care by
     taking his medically authorized extra bedding from his
     cell;

7.   The United States of America, the United States
     Department of Justice, and the BOP, denied Kelly the
     right to petition the government for a redress of
     grievances under the Federal Tort Claims Act ("FTCA"),
     28 U.S.C. § 2671 et seq., when they ignored or
     improperly denied Kelly's administrative tort
     complaints;

8.   Kelly's rights under the Freedom of Information Act
     ("FOIA"), 5 U.S.C. § 552, governing access to
     governmental records to be granted by federal agencies,
     and the Health Insurance Portability and Accountability
     Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d – 1230d-8,
     were violated by the defendants; failure to obtain
     Kelly's medical records.

<u>Discussion</u>

I.   <u>Claims Against Federal Defendants</u>

   A.   <u>Federal Agencies</u>

   Kelly has named, or otherwise implicated, a number of

federal governmental institutions and agencies as defendants to

this action, including: the United States of America, the United

States Department of Justice, the federal Bureau of Prisons, the

United States Marshals Service, FCI Otisville, FCI Fort Dix, and

the BFDC.  The federal government, including its agencies, is

absolutely immune from suit absent an express waiver of immunity.

<u>See</u> <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941).  Where

15

the United States has waived immunity, no suit can be maintained unless it is in exact compliance with the terms of the statute under which the sovereign has consented to be sued.  See United States v. Nordic Vill., Inc., 503 U.S. 30, 34 (1992).  While a Bivens action allows constitutional claims to be raised against federal officials in their individual capacities, Bivens does not override the federal government's sovereign immunity.  McCloskey v. Mueller, 446 F.3d 262, 271–72 (1st Cir. 2006).

The Federal Tort Claims Act ("FTCA") is a waiver by Congress of the sovereign immunity of the United States for claims arising out of torts committed by federal employees.  See 28 U.S.C. § 1346(b)(1); Barrett v. United States, 462 F.3d 28, 36 (1st Cir. 2006).  "The waiver effected by the FTCA is, however, closely circumscribed by the terms of the statute."  Rakes v. United States, 442 F.3d 7, 18 (1st Cir. 2006).  Those terms include both an administrative exhaustion requirement and a limitations period for filing suit after a final denial of the administrative complaint.  See Barrett, 462 F.3d at 36.  An administrative claim must be "presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b).  An administrative claim is then considered to be administratively

exhausted only when "(i) the agency finally denies the administrative claim, or (ii) six months pass without a final denial of the administrative claim – whichever comes first." Barrett, 462 F.3d at 36.

Here, Kelly filed three administrative claims against the federal government.  Kelly received no response to his first claim, filed in June 2005, until April 2007, when he was advised that there was no record of his claim.  Kelly asserts that the material mailed with that letter indicate that the claim was, in fact, received by the BOP.  If that is the case, the failure of the BOP to respond to the claim within six months of filing, or by December 2005, rendered the claim exhausted.  The second administrative claim was filed in December 2007 and never responded to.  Accordingly, that claim was exhausted in June 2008.  Once each of these claims was exhausted, Kelly was obliged to file this action within six months.  See 28 U.S.C. 2401(b). Kelly's failure to file this action until August 5, 2009 renders these claims time-barred and mandates their dismissal.

Kelly's third administrative claim was filed with the BOP on July 23, 2009.  Although Kelly did not receive a response prior to filing this action, the claim is not exhausted because the six

month period during which the BOP might respond has not yet run.
See 28 U.S.C. § 2675(a).  Under the FTCA, a court suit filed
before exhaustion does not ripen, but is barred.  See Velez-Diaz
v. United States, 507 F.3d 717, 718 (1st Cir. 2007) (citing
McNeil v. United States, 508 U.S. 106, 112-13 (1993)).  This
claim, accordingly, should be dismissed without prejudice to
Kelly's ability to refile after the exhaustion period.

  B. Individuals

  A Bivens action authorizes a lawsuit for money damages
against federal officers for violations of a prisoner's Eighth
Amendment right to be free of cruel and unusual punishment.  See
Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 67 (2001) (citing
Carlson v. Green, 446 U.S. 14, 18 (1980) ("Bivens established
that the victims of a constitutional violation by a federal agent
have a right to recover damages against the official in federal
court despite the absence of any statute conferring such a
right.").  Kelly alleges that an individual named Ms. Garrett was
his contact person at the BFDC for his chronic care services.
Kelly also alleges that he did not receive those services.  Kelly
has not stated any action taken or omitted by Garrett, however,
indicating that she had any part, either by act or omission, in

denying Kelly access to his medication.  Kelly also claims that

an individual at the BFDC named Bailey was rude and verbally

abusive, and threatening to him.  As a result, he states that he

holds Bailey responsible for the denial of his anti-seizure

medication at the BFDC.  While Kelly describes unprofessional

acts by Bailey, he has not alleged any specific action by her

that deprived him of his medication.  Accordingly, I find that

Kelly has failed to state any Bivens claim for the denial of

adequate medical care against Ms. Garrett or Bailey.

Kelly further claims that individual BFDC officers violated

his right to petition the government for a redress of grievances

by failing to respond to administrative grievances he filed after

he was sexually assaulted at the BFDC.  Assuming, without

deciding, that a Bivens action is available to remedy a violation

of an inmate's First Amendment right to petition the government

for a redress of grievances,[4] I find that Kelly has not stated

sufficient facts to allege such a claim.  Kelly has not

---

[4]The Supreme Court has not specifically extended the holding
of Bivens to suits alleging that inmates were denied First
Amendment, rather than Eighth Amendment rights.  See Iqbal, 129
S. Ct. at 1948 (assuming, without deciding, that a First
Amendment claim was properly brought under Bivens, while citing
Bush v. Lucas, 462 U.S. 367 (1983) to demonstrate that the Court
has declined to extend Bivens to First Amendment claims).

demonstrated that he was prevented from filing his grievances with the BFDC officers, or that he was prevented from filing grievances with higher level BFDC officials upon not receiving a response.  Further, Kelly has alleged no facts which demonstrate that he was entitled to any administrative relief that he was denied as a result of the officers' failure to respond to his grievances.  Kelly has not alleged that his right to petition was impinged, only that he did not receive the response to his grievances that he was hoping for.  Accordingly, I find that Kelly has failed to state any claim upon which relief might be granted against the BFDC officers who did not respond to his grievances.[5]

II.   Claims Against State Defendants

A.   Section 1983

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional

---

[5]If Kelly intended to claim that the named BFDC officers failed to protect him, in violation of his Eighth Amendment rights, he has failed to state sufficient facts to state such a claim.  Should Kelly attempt, in the future, to file such a claim with additional specificity, he would be well-advised to do so in the United States District Court, New York Western District, as that court, unlike this Court, has personal jurisdiction over those individuals.

or statutory law.  <u>See</u> 42 U.S.C. § 1983[6]; <u>City of Okla. City v.</u>
<u>Tuttle</u>, 471 U.S. 808, 829 (1985); <u>Wilson v. Town of Mendon</u>, 294
F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held
liable under § 1983, his or her conduct must have caused the
alleged constitutional or statutory deprivation.  <u>See</u> <u>Monell v.</u>
<u>Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978); <u>Soto v. Flores</u>,
103 F.3d 1056, 1061–62 (1st Cir. 1997).  Here, Kelly claims that
defendant SCHC employees are state actors, and that they violated
his federal constitutional right not to be subjected to cruel and
unusual punishment, as well as his rights under the ADA.  Kelly's
claims against the SCHC defendants, therefore, arise under §
1983.

     B.   <u>ADA</u>

     Title II of the ADA provides that "no qualified individual
with a disability shall, by reason of such disability, be

---

[6]42 U.S.C. § 1983 provides that:

        Every person who under color of any statute,
        ordinance, regulation, custom, or usage, of any
        State or Territory or the District of Columbia,
        subjects, or causes to be subjected, any citizen of
        the United States or other person within the
        jurisdiction thereof to the deprivation of any
        rights, privileges, or immunities secured by the
        Constitution and laws, shall be liable to the party
        injured in an action at law . . . .

excluded from participation in or be denied the benefits of the
services, programs, or activities of a public entity, or be
subjected to discrimination by any such entity."  42 U.S.C. §
12132.

> Pursuant to the plain language of Title II, a plaintiff
> must establish: (1) that he is a qualified individual
> with a disability; (2) that he was either excluded from
> participation in or denied the benefits of some public
> entity's services, programs, or activities or was
> otherwise discriminated against; and (3) that such
> exclusion, denial of benefits, or discrimination was by
> reason of the plaintiff's disability.

Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000).

Title II of the ADA applies to inmates in correctional

facilities.  See Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206,

209-10 (1998).  "[P]risons provide inmates with many recreational

'activities,' medical 'services,' and educational and vocational

'programs,' all of which at least theoretically 'benefit' the

prisoners (and any of which disabled prisoners could be 'excluded

from participation in.')."  Id. at 210.

Kelly alleges that his disabling head injury, and medical

conditions related thereto, require that he be provided with

handrails and elevated fixtures to accommodate his equilibrium

and balance problems.  As I must assume that the facts as alleged

by Kelly are true for purposes of conducting this review, I find,

for purposes of preliminary review, that Kelly has a qualifying
disability and that he was denied a handicapped-equipped cell
that he required to accommodate his disability.  Kelly's claim
fails, however, as he has failed to demonstrate that he was
denied an appropriately adapted cell because of his disability.
To the contrary, by Kelly's own admission, he was denied a
handicapped cell because of the SCHC policy of double bunking
inmates, and not for any reason having to do with his physical
condition.  Accordingly, I find that Kelly has failed to state a
claim under the ADA and recommend that this claim be dismissed.

      C.   <u>Eighth Amendment Claims</u>

     Kelly alleges that his Eighth Amendment right to adequate
medical care was violated when an individual named Tracy failed
to provide him with his anti-seizure medication.  Kelly has
stated that he has a serious seizure disorder that causes him to
have grand mal and petit mal seizures up to fifteen times a week.
Kelly states that prison doctors in other facilities have
prescribed Dilantin for him, but that the SCHC has refused to
provide him with that or any anti-seizure medication.  As a
result, Kelly alleges that his seizure condition is now entirely
untreated and is worsening.  Kelly also alleges that provision of

his necessary compression stockings has been denied or
significantly delayed, and that aspirin he takes to prevent blood
clots or a heart attack has been improperly discontinued.

These allegations suffice to state a claim that Kelly's
Eighth Amendment right to adequate medical care has been
violated.  However, Kelly has failed to name any defendant
amenable to suit in this action, as he has only named an
individual with the first name "Tracy."  I recommend, therefore,
that this claim be dismissed for failure to adequately name a
defendant responsible for the constitutional violations alleged.
The dismissal of these claims, however, should be without
prejudice to Kelly refiling this claim once he obtains Tracy's
last name.[7]

Kelly further alleges that SCHC Officers Bromfield and
Casavant violated his Eighth Amendment right to adequate medical
care and his rights under the ADA when they seized extra bedding
from his cell that had been authorized by the medical department.
I find that Kelly's allegation that he was denied extra bedding

---

[7]Kelly alleges in his complaint that the SCHC medical
personnel wear their identification badges in a manner that
hinders his ability to read their names.  There is no indication
in the complaint, however, that Kelly would be unable to obtain
Tracy's last name by making proper inquiry, either of Tracy, or
by the administrative request procedure at the SCHC.

is inadequate to state a claim for a violation of his
constitutional rights, as his allegations are insufficiently
serious to assert that he was subjected to conditions or
treatment by Bromfield and Casavant that constituted a denial of
adequate medical care for his serious medical conditions or a
denial of services attributable to discrimination against him
based on his disability.

     D.   <u>Municipal Liability</u>

     Kelly names the SCHC as a defendant to this action.
Municipalities and local government entities are "persons" within
the meaning of § 1983.  <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436
U.S. 658, 690 (1978).  Under New Hampshire law, counties, such as
Strafford, are considered local governmental units.  <u>See</u> N.H.
Rev. Stat. Ann. ("RSA") 507–B:1 (1997) (defining "governmental
unit" as "any political subdivision within the state including
any county, city, town . . ., but [not including] the state or
any department or agency thereof.").  In order to maintain an
official capacity suit against Strafford County as a municipality
under § 1983, the claim must be grounded upon an unconstitutional
municipal custom or practice and two requirements must be met.
"First, the custom or practice must be attributable to the

municipality, i.e., it must be 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'"  Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir. 2000) (quoting Bordanaro v. Mcleod, 871 F.2d 1151, 1156 (1st Cir. 1989)).  Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights.  Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 64 (2003) (citing Miller, 219 F.3d at 12).

Kelly has not asserted any facts that demonstrate that Strafford County engaged in a custom or policy of allowing or enabling employees of the SCHC to violate Kelly's rights in the manner described in his complaint.  I find, therefore, that Kelly has not stated a claim against the SCHC.

III. Medical Records Claims

Kelly alleges that the BFDC and SCHC have failed to obtain his relevant medical records from FCI Otisville and FCI Fort Dix. Kelly alleges that these prisons' failure to obtain his records violates his rights under FOIA and HIPAA.

A.   <u>FOIA</u>

FOIA requires federal agencies, upon request, to make certain documents, regulations, and records available to the public.  <u>See</u> 5 U.S.C. § 552(a); <u>Toledo v. P.R. Labor & Human Res. Dep't</u>, 203 F. Supp. 2d 127, 130 (D.P.R. 2002).  Kelly does not allege that the BOP, upon receiving a proper request for records, failed to produce them, but that the medical departments treating Kelly failed to request them.  FOIA does not require Kelly's current medical providers to request his past medical records. Absent an allegation that Kelly's own request for records from the BOP was denied, I recommend dismissal of this claim.

B.   <u>HIPAA</u>

Kelly also asserts that the failure to obtain his medical records violated his rights under HIPAA.  Even assuming that Kelly's right to obtain his medical records is protected by HIPAA, the statute does not provide a private right of action to the individuals it protects.  <u>See</u> <u>Marquez v. Principi</u>, Civil No. 06-1581 (RLA), 2009 WL 414464, at *5 (D.P.R. Feb. 18, 2009) (collecting cases).  While civil and criminal penalties are available for certain violations of HIPAA's requirements, the statute specifically delegates enforcement of those penalties to

the Secretary of Health and Human Services.  <u>See</u> 42 U.S.C. §
1320d–5; <u>Acara v. Banks</u>, 470 F.3d 560, 571 (5th cir. 2006);
<u>Marquez</u>, 2009 WL 414464, at *5.  Accordingly, this Court lacks
subject matter jurisdiction to entertain such a claim.  <u>See</u>
<u>Marquez</u>, 2009 WL 414464, at *5; <u>Johnson v. Quander</u>, 370 F. Supp.
2d 79, 100 (D.D.C. 2005) ("because no private right of action
exists under the HIPAA, this Court does not have subject matter
jurisdiction over this claim").  I recommend that Kelly's HIPAA
claim be dismissed for lack of subject matter jurisdiction.

<u>Conclusion</u>

     For the foregoing reasons, I recommend dismissal of all of
the claims and defendants in this action.  Any objections to this
report and recommendation must be filed within ten (10) days of
receipt of this notice.  Failure to file objections within the
specified time waives the right to appeal the district court's
order.  <u>See</u> <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979

F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>,

792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date:       November 10, 2009

cc:         Howard Dennis Kelly, pro se


JM:jba